OPINION
 

 PER CURIAM.
 

 In a suit filed by Floyd Dixon against First National Acceptance Company, Michael Bramble and Roxanne Bramble, the trial court found lack of consideration for a real estate lien note and deed of trust, found a subsequent transfer to be a partial assignment and the transferee to be subject to defenses against enforcement of the note and deed of trust, set aside a foreclosure sale, and voided the note and lien. First National Acceptance Company raises three issues in its appeal. Because we find the indorsement of the promissory note was not a partial assignment, we reverse the trial court’s judgment.
 

 First National buys “B Paper” loans made by persons with inferior credit. Rather than buy the entire note, First National purchases a stream of payments in what it calls a “partial transaction.” The controversy involves a promissory note, in the amount of $60,000 payable in monthly installments of $653.97 at 10.25% interest, secured by a deed of trust lien on business property of Dixon’s located on Washington Boulevard. Before making its offer, the appellant’s analyst conducted a telephone interview with a person claiming to be Dixon, and verified the information provided by Bramble. Bramble and First National executed an agreement, titled “Purchase and Sale Agreement TX Deed of Trust Partial Purchase Program,” in which First National bought the next 60 installments of the note for $26,790.11. After closing costs, Bramble received a check for $25,635.07. On November 29, 1999, the Brambles executed an indorsement that stated “Pay without recourse to the order of First National Acceptance Company.” The indorsement was physically attached to the note. Thus, the in-dorsement purported to convey the entire note to the appellant, although First National had purchased only 60 payments. According to First National’s corporate representative, had the 60 notes been paid according to the terms of the note, there would have been $30,000 left owing and the note would have “reverted” to Bramble. First National would have received a 16.1 percent return. First National received payments of $1,200.00 and $3,807.62 in May and July 2000, but eventually foreclosed on the property. First National purchased the property for $60,000 at the February 2001 trustee’s sale. Under the terms of the contract, Bramble may be entitled to some of the proceeds on resale of the property by First National. Any rights of the Brambles to any proceeds from any subsequent sale of the land are subject to the claims and defenses of Dixon in this lawsuit.
 

 Floyd Dixon and Michael Bramble were friends. Bramble always talked about business, but Dixon claimed they had no business transactions other than Bramble occasionally assisting at Dixon’s restaurant, and a $2,000 loan Bramble made to Dixon in 1996 in connection with the operation of the restaurant. That loan was secured by a lien on the property involved in this litigation. Dixon testified that he repaid that loan. Dixon did not recall having signed the note and deed of trust in
 
 *206
 
 question, but did recall having given Bramble a power of attorney because Bramble was in the process of trying to sell the property for Dixon. Dixon testified, “And I signed some notes, you know, for — to try to get him to sell my property.” He added, “And I was in the cafi one day and I signed some papers, a lot of papers, for Mike.” Bramble dealt in real estate, and Bramble told Dixon that there were a lot of people overseas who wanted to buy American property, and that he thought he could sell the property for $250,000. The property was worth approximately $80,000. Dixon did not recall having spoken to the appellant’s loan analyst. Dixon admitted he received $4,000 of the proceeds from the Bramble/First National transaction. When Dixon started receiving late payment notices from First National, he knew what they were talking about because he had discussed it with Bramble and he had received “a phone call about the loan that Mike and I had together.” He took the bills to Bramble, who told Dixon he would “tae care of it.” When Bramble did not take care of it, Dixon called First National. After Dixon and his wife Carol confronted Bramble, the Dixons made a $1,200 payment to First National.
 

 Carol Dixon testified that she found out about the note in June, and Dixon told him “that was something concerning Michael.” She agreed to pay two payments if Bramble would “take care of the rest.” Later that same month, she was unable to refinance her car because the note appeared on her credit.
 

 Michael Bramble testified that he is a Canadian citizen with some university education. For six months he “had a mortgage company” with a person who possessed a broker’s license, and understood the mortgage industry. He had a conviction for fraud in connection with an immigration consulting service he ran. Bramble admitted that no consideration passed for the note and deed of trust in the Dixon/Bramble transaction. Bramble claimed Dixon executed the papers in 1998 in order to “protect his business from his wife Carol.” Bramble claimed he and Dixon were renovating another property, that he told Dixon they could “apply for mortgage on the note” and use the money to fix the other building. Bramble also claimed that the “McFaddin Street” property was in Bramble’s name because Dixon did not want Carol Dixon to be a part of it. According to Bramble, Dixon was aware of what he was doing from the start, and the loan analyst did talk to Dixon. Roxanne Bramble wrote Dixon a check for $4,000 a few days after Bramble received the proceeds from First National, and Bramble forgave the $2,000 loan. In order to pay the money back to First National, they had to turn the other property, in which he had invested $12,000 of the money he obtained selling the note to the appellant. Roxanne made the $3,307.62 payment to First National. Unfortunately, while Bramble was in Buffalo, the City tore down the McFaddin Street building. Carol then found out, and Dixon stopped cooperating. Bramble complained that First National failed to notify him that they were foreclosing, although he is a part owner of the note.
 

 Attached to the note is an indorsement, “without recourse” but otherwise unqualified. The contract between First National and Bramble reveals that First National paid $26,790.11 for the next 60 payments due on a $60,000 note with a $56,421.38 balance. The parties agree the Dixon/Bramble transaction was a sham and no real consideration existed for the $60,000 note. There is no evidence that First National was aware of the true situation. The trial court found: (1) Bramble transferred only 60 payments of the $60,000 note, not the entire note, and as a result
 
 *207
 
 First National became a partial assignee of the note with Michael Bramble; (2) as a partial assignee First National was not a holder in due course; (3) Bramble was not entitled to payment from Dixon; (4) therefore, First National was not entitled to enforce the note or the lien against Dixon. In its first issue, First National argues the trial court erred in holding it was a partial assignee rather than a holder in due course. First National contends that it proved as a matter of law it obtained the note and deed of trust from the original payee, Michael Bramble, joined pro forma by his wife, Roxanne Bramble, paid value for the instrument, and had no notice of any defenses claimed by the maker, Floyd Dixon.
 

 First National had actual possession of a note that had been indorsed to it. Therefore, the appellant was a “holder.” See Act of May 28, 1995, 74th Leg., R.S., ch. 921, § 2, 1995 Tex. Gen. Laws 4626 (amended 1999, 2008)(current version at Tex. Bus. & Com.Code Ann. § 1.201 (Vernon Supp.2004)). The holder of an instrument is a “holder in due course” if:
 

 (1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and (2) the holder took the instrument:
 

 (A) for value;
 

 (B) in good faith;
 

 (C) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series;
 

 (D) without notice that the instrument contains an unauthorized signature or has been altered;
 

 (E) without notice of any claim to the instrument described in Section 3.306; and
 

 (F) without notice that any party has a defense or claim in recoupment described in Section 3.305(a).
 

 Tex. Bus. & Com.Code Ann. § 3.302(a) (Vernon 2002).
 
 [1]
 

 If Dixon has a defense, the note cannot be enforced by one not a holder in due course. The trial court found that First National was not a holder in due course
 
 *208
 
 because tbe transfer was a partial assignment. Negotiation is transfer of possession of an instrument by a person other than the issuer to a person who thereby becomes its holder. Tex. Bus. & Com. Code Ann. § 3.201(a) (Vernon 2002). Negotiation of an instrument not payable to bearer requires transfer of possession of the instrument and indorsement by the holder. Tex. Bus.
 
 &
 
 Com.Code Ann. § 3.201(b) (Vernon 2002). An indorsement is “a signature, other than that of a signer as maker ... that alone or accompanied by other words is made on an instrument for the purpose of (i) negotiating the instrument, (ii) restricting payment of the instrument, or (iii) incurring indorser’s liability on the instrument....” Tex. Bus. & Com.Code Ann. § 3.204 (Vernon 2002). “[A] signature and its accompanying words is an indorsement unless the accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for a purpose other than in-dorsement. For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument.” Id. “An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.” Tex. Bus. & Com.Code Ann. § 3.203(a) (Vernon 2002). “If a transferor purports to transfer less than the entire instrument, negotiation of the instrument does not occur. The transferee obtains no rights under this chapter and has only the rights of a partial assignee.” Tex. Bus. & Com.Code Ann. § 3.203(d) (Vernon 2002).
 

 The crucial issue for the appellant’s status as a holder in due course is whether it is merely a partial assignee under Section 3.203(d). First National argues the in-dorsement itself is what controls, and the legal effect of its transaction was to make First National the owner of the note with Michael Bramble having only a contingent future interest in the remaining payments due. Dixon contends that Bramble purported to transfer only 60 of the installments payable under the note. In support of his contention Dixon relies upon the comment to UCC Section 3-203 and its reference to former UCC Section 3-202(3).
 

 The Uniform Commercial Code Comment to Section 3-203 states the following:
 

 5. Subsection (d) restates former Section 3-202(3). The cause of action on an' instrument cannot be split. Any in-dorsement which purports to convey to any party less than the entire amount of the instrument is not effective for negotiation. This is true of either “Pay A one-half,” or “Pay A two-thirds and B one-third.” Neither A nor B becomes a holder. On the other hand an indorsement reading merely “Pay A and B” is effective, since it transfers the entire ' cause of action to A and B as tenants in common. An indorsement purporting to convey less than the entire instrument does, however, operate as a partial assignment of the cause of action. Subsection (d) makes no attempt to state the legal effect of such an assignment, which is left to other law. A partial assignee of an instrument has rights only to the extent the applicable law gives rights, either at law or in equity, to a partial assignee.
 

 Tex. Bus. & Com.Code Ann. § 3.203 cmt. 5 (Vernon 2002). Former Section 3.202(c) provided: “An indorsement is effective for negotiation only when it conveys the entire instrument or any unpaid residue. If it purports to be of less it operates only as a partial assignment.” Act of May 25, 1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2417, amended by Act of May 28, 1995, 74th Leg., R.S., ch. 921, § 1, 1995 Tex. Gen. Laws 4582, 4588.
 

 
 *209
 
 Dixon argues the entire Bramble/First National transaction must be considered in determining whether the indorsement is a partial assignment. In support
 
 of his
 
 argument, the appellee relies upon Business and Commerce Code Section 3.117, which provides as follows:
 

 “[T]he obligation of a party to an instrument to pay the instrument may be modified, supplemented, or nullified by a separate agreement of the obligor and a person entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement. To the extent an obligation is modified, supplemented, or nullified by an agreement under this section, the agreement is a defense to the obligation.”
 

 Tex. Bus. & Com.Code Ann. § 3.117 (Vernon 2002).
 

 To support his argument that the in-dorsement operated as a partial assignment because Bramble’s contemporaneously executed agreement to sell the next 60 payments due on the promissory note purported to transfer less than the entire note, Dixon relies upon two cases:
 
 First Valley Bank v. First Sav. and Loan Ass’n of Cent. Ind.,
 
 412 N.E.2d 1237 (Ind.Ct. App.1980), and
 
 Lipkowitz & Plaut v. Affrunti,
 
 95 Misc.2d 849, 407 N.Y.S.2d 1010 (Sup.Ct.1978). In
 
 First Valley Bank
 
 the issue was whether a bank intended an unqualified indorsement on a mortgage note to be without recourse.
 
 Id.
 
 at 1241-42. The court noted “that as between an endorser and his immediate endorsee, the transaction is to be viewed as a whole, as an ordinary contract.”
 
 Id.
 
 at 1242. The words “without recourse” appeared on neither document, and the court held that words of assignment in the assignment contract did not affect the character of the unqualified endorsement.
 
 Id.
 
 at 1243. Here, the contract between Bramble and First National does not mention the in-dorsement of the note, other than to provide for cancellation should Bramble fail to deliver and assign the Dixon note and deed of trust.
 

 In Lipkowitz, a man named Gray executed a collateral assignment and indorsed four notes to the first secured party.
 
 Lipkowitz,
 
 407 N.Y.S.2d at 1011. While the notes were in the possession of the first secured party, Gray executed a collateral assignment to the second secured party.
 
 Id.
 
 at 1012. Upon payment of the amount owed to it, the first secured party transferred possession of the note to the second secured party without indorsement.
 
 Id.
 
 The parties executed written acknowledgments of the assignment of the notes and pledge agreements.
 
 Id.
 
 In deciding when the second secured party acquired a perfected security interest vis vis a tax lien, the court found that Gray “did not irrevocably divest himself of the ultimate right to all of the proceeds of said notes” but “retained ownership of all proceeds not required to satisfy the ... obligation [to the first secured party].”
 
 Id.
 
 at 1013. The court ruled that the transaction from Gray to the first secured party created only a partial assignment of the proceeds, that the limited interest acquired by the first secured party was a security interest, and that Gray retained “a right to future performance” on the notes.
 
 Id.
 
 As the interest retained was a property interest, Gray retained a claim or demand capable of being collaterally assigned to the plaintiff in the case, the second secured party, who then sought acceleration.
 
 Id.
 
 The court ruled that the second secured party was an assignee of a collateral interest in the proceeds of the notes and was a holder of a security interest in the notes, but was not a holder of the negotiable instruments because the notes had never been indorsed to it.
 
 Id.
 
 Thus, the plaintiff became an
 
 *210
 
 assignee of the notes by virtue of the instrument of assignment, and upon receipt of the notes without indorsement became a transferee, but was not a holder and therefore did not possess the right to accelerate the notes.
 
 Id.
 
 The court decided that the second secured party was entitled to the payments and interest due to date, but was not entitled to accelerate the note “until such time as [the first secured party’s] indorsement is procured.”
 
 Id.
 
 at 1015. Thus, the case turned on the lack of an indorsement. Here, the note has been endorsed to the appellant. The “Purchase and Sale Agreement” clearly contemplated that First National would have the sole power to enforce the note, to foreclose, and to dispose of the property after foreclosure.
 

 According to Dixon, the “Purchase and Sale Agreement” modified the indorsement and prevented negotiation of Dixon’s note. A similar issue was presented to the court in a pre-code case,
 
 Slay v. Wheeler,
 
 84 S.W.2d 841 (Tex.App.-Eastland 1935, writ ref'd).
 
 [2]
 
 Wheeler executed a $942.56 note payable to the order of a party who indorsed the note to Slay.
 
 Slay,
 
 84 S.W.2d at 841. A written agreement executed with the indorsement stated that “the first maturing $500 of said note is owned by the said Frank C. Slay, and that the last maturing installments of said note of $442.56 is owned by [the indorser] ....”
 
 Id.
 
 at 841-42. Upon payment of the first-maturing $500, Slay was to reconvey to the indorser the unpaid balance of the note.
 
 Id.
 
 at 842. Slay sued Wheeler on the entire note, and Wheeler asserted a defense of duress to the $942.56 note.
 
 Id.
 
 The court held that to be effective an indorsement of a negotiable instrument must be an indorsement of the entire instrument.
 
 Id.
 
 at 843. The court found the payee had indorsed the note as it was in form “strictly in accordance with the character of indorsement required for negotiable instruments.”
 
 Id.
 
 Holding “it cannot be regarded as a split indorsement” because neither the note nor the indorsement indicated an attempt to transfer any partial interest in the note, “[a]s thus indorsed and transferred, the makers thereof could have paid the entire amount of the note to Slay with perfect safety against the rights of [the indorser] to make any claim whatever against [the maker].”
 
 Id.
 
 at 843-44. The court reasoned that certain rights and beneficial interests were retained by the transferors in the event of certain contingencies, a situation analogous to a collateral assignment of a security interest for an obligation smaller than the amount of the note where the transferee retains the surplus for the benefit of the transferor.
 
 Id.
 
 at 844. The court held:
 

 [t]he authorities cited by the appellees deal strictly with “split indorsements,” carried by the note itself. Such indorse-ments undoubtedly affects the negotiability of the instrument. But a collateral agreement evidencing (1) merely a divided interest in the proceeds of the note, (2) that the beneficial interest, if any, of the transferor is wholly contingent in nature, and (3) subordinate to that of the transferee, does not, in our opinion, affect the negotiability of the note. It affects neither the form of the negotiable instrument nor the indorsements thereof.
 

 
 *211
 

 Id.
 
 The court held Slay could recover $500 plus interest and rendered judgment for foreclosure of the vendor’s lien on the real property.
 
 Id.
 
 at 845.
 

 The agreement between Bramble and First National does not alter Bramble’s indorsement. Bramble indorsed the note with the following language: “Pay without recourse to the order of First National Acceptance Company.” That act is an in-dorsement under Business and Commerce Code Section 3.204, and together with possession of the document is sufficient to transfer the instrument under Section 3.203 and for negotiation under Section 3.201 and made First National a holder. The only basis asserted by Dixon for denying First National holder in due course status is Section 3.203(d), which we hold does not apply in this case. Therefore, First National is a holder in due course as a matter of law, and the trial court erred in holding First National was a mere as-signee.
 

 We sustain the first issue raised by the appellant. The remaining issues were raised in the alternative; therefore, we decline to address those issues as their resolution is not necessary to the disposition of the appeal. We neither address nor disturb the findings regarding Bramble, who did not appeal, nor the merits of any claims or defenses at issue in this litigation other than issue one. The rights of the parties are so interwoven as to require reversal of the entire judgment. Tex.R.App. P. 25.1. We therefore reverse the judgment of the trial court and remand the case to the trial court for further proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . Various enforcement rights and defenses are affected by the presence or absence of status as a holder in due course. For instance, "[a] person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds.” Tex. Bus. & Com.Code Ann. § 3.306 (Vernon 2002). "A person having rights of a holder in due course takes free of the claim to the instrument.”
 

 Id. The right to enforce the obligation of a party to pay an instrument is subject to a defense of the obligor based on "duress ... or illegality of the transaction that, under other law, nullifies the obligation of the obligor” or "fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms_” Tex. Bus. & Com. Code Ann. § 3.305(a)(1) (Vernon 2002). "The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in Subsection (a)(1)_” Tex. Bus. & Com.Code Ann. § 3.305(b) (Vernon 2002). Negotiation, however, is effective even if obtained by fraud, duress, or mistake. Tex. Bus. & Com. Code Ann. § 3.202(a)(2) (Vernon 2002). "To the extent permitted by other law, negotiation may be rescinded or may be subject to other remedies, but those remedies may not be asserted against a subsequent holder in due course or a person paying the instrument in good faith and without knowledge of facts that are a basis for rescission or other remedy.” Tex. Bus. & Com.Code Ann. § 3.202(b) (Vernon 2002).
 

 [2]
 

 . Article 5934, section 32 of the Negotiable Instruments Act provided: "The indorsement must be an indorsement of the entire instrument. An instrument which purports to transfer to the indorse a part only of the amount payable, or which purports to transfer the instrument to two or more endorsees severally, does not operate as a negotiation of the instrument. But where the instrument has been paid in part, it may be indorsed as to the residue."
 
 Slay,
 
 84 S.W.2d at 843.